UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE FORD,

        Plaintiff,               Case No. 4:22-CV-12368
                                   District Judge George Caram Steeh
v.                             Magistrate Judge Anthony P. Patti

LARRY BROWN and
DEREK GOWDY,

        Defendants.
_____/

## REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY ENFORCEMENT OF SETTLEMENT AGREEMENT (ECF NO. 17) AND TO GRANT DEFENDANTS' MOTION TO DISMISS (ECF NO. 14)

## I.    RECOMMENDATION

The Court should **DENY** Plaintiff's Motion for Summary Enforcement of

Settlement Agreement (ECF No. 17) and **GRANT** Defendants' Motion to Dismiss.

(ECF No. 14).

## II.    REPORT

### A.    Background

Plaintiff George Ford, a state prisoner who is proceeding *in pro per*, filed the

instant lawsuit against Defendants Larry Brown and Derek Gowdy to challenge his

designation as a member of a security threat group ("STG").  Plaintiff claims that

Defendants violated his rights under the First and Fourteenth Amendment and seeks declaratory, injunctive, and monetary relief. (ECF No. 1, PageID.10-11.)

After the case was filed, it was stayed and referred to the *Pro Se* Early Mediation Program. (ECF No. 4.) Assistant Attorney General Austin Raines entered a limited appearance, representing Defendants for the limited purpose of participating in the Early Mediation Program. (ECF No. 7.) The parties were ordered to appear for a mediation conference on February 7, 2023. (ECF No. 8.) The case did not settle, and the stay was lifted. (ECF No. 9.) With the mediation process concluded, Attorney Raines was discontinued from receiving ECF notifications, as reflected in the March 4, 2023 docket entry, and a new Assistant Attorney General (Joshua D. Marcum) filed an appearance on behalf of Defendants on April 25, 2023. (ECF. No. 13.)

On the very day of AAG Marcum's appearance, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) over Marcum's signature. Thereafter, Plaintiff filed a "Motion for Summary Enforcement of the Settlement Agreement." (ECF No. 17.) In his motion, Plaintiff states that following the mediation, he and Attorney Raines participated in a telephone conference on April 6, 2023. (ECF No. 17, PageID.94.) According to Plaintiff, during the conference, he and Raines "agreed that we would settle the case for $850 and the immediate[] removal of my Security Threat Group (STG)

2

designation." (*Id.*)  Attached to the motion is Plaintiff's sworn and notarized affidavit, attesting to his version of the April 6, 2023 conference.  (*Id.* at PageID.99-100.)  Plaintiff contends that he and Raines verbally settled the case and he then waited for Raines to send him release and dismissal forms, which he never received.  (*Id.* at PageID.95.)  Plaintiff asks the Court to enforce the alleged verbal settlement.

In response, Defendants filed a brief opposing Plaintiff's motion to enforce the settlement.  They agree that Plaintiff and Raines participated in an additional settlement discussion on April 6, 2023, but assert that no agreement was reached. (ECF No. 18, PageID.104-105.)  Instead, Raines submits his own affidavit, averring that during the April discussion, Plaintiff conveyed his settlement terms, which Raines indicated he would relay to the Michigan Department of Corrections ("MDOC") for consideration.  (*Id.* at PageID.109.)  The MDOC did not agree to the terms, and thus Raines states that there was no agreement to the essential terms of a settlement.  (*Id.*)  In light of the conflicting affidavits, I conducted an evidentiary hearing on December 20, 2023, pursuant to 28 U.S.C. § 636(b)(1)(B), and make proposed findings and recommendations consistent with the discussion appearing below.

Plaintiff testified live on behalf of his position, and Defendant presented two witnesses, Attorney Raines and Jaquine Castillo, a litigation specialist for the

3

MDOC and the client representative for the MDOC.  The matter was taken under advisement and both the motion to dismiss and the motion to enforce the settlement are now ready for determination.

### B.   Standard

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true."  *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (concluding that a plausible claim need not contain "detailed factual allegations" but must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action").  Facial plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct."  *16630 Southfield Ltd. P'Ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).  To make this determination, a court "may consider the Complaint and any exhibits attached

thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Furthermore, the Court holds *pro se* complaints to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). However, even in pleadings drafted by *pro se* parties, "'courts should not have to guess at the nature of the claim asserted.'" *Frengler v. Gen. Motors*, 482 F. App'x 975, 976-77 (6th Cir. 2012) (quoting *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)). Moreover, "courts may not rewrite a complaint to include claims that were never presented, nor may courts construct the plaintiff's legal arguments for him. Neither may the Court 'conjure up unpled allegations[.]'" *Rogers v. Detroit Police Dep't*, 595 F.Supp.2d 757, 766 (E.D. Mich. 2009) (Ludington, J., adopting report and recommendation of Binder, M.J.) (internal citations omitted); *see also Evans v. Mercedes Benz Fin. Servs., LLC*, No. 11-11450, 2011 WL 2936198, at *2 (E.D. Mich. July 21, 2011) (Cohn, J.) ("Even excusing plaintiff's failure to follow Rules 8(a)(2) and 10(b), a *pro se* plaintiff must comply with basic pleading requirements, including Rule 12(b)(6).").

## C.   Discussion

### 1.  Motion to Enforce Settlement

"It is well established that courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them." *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992) (quoting *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988)). This Court's "power to summarily enforce settlements extends to cases where the parties' agreements are not in writing and even to those settlement agreements made off the record, not in the presence of the court." *Henley v. Cuyahoga Cnty. Bd. of Mental Retardation & Developmental Disabilities*, 141 F. App'x 437, 442 (6th Cir. 2005) (citing *Bowater N. Am. Corp. v. Murray Mach., Inc*., 773 F.2d 71, 76–77 (6th Cir. 1985); *Kukla v. Nat'l Distillers Prods., Co*., 483 F.2d 619, 621 (6th Cir. 1973) ("[T]he power of a trial court to enforce a settlement agreement has been upheld even where the agreement has not been arrived at in the presence of the court nor reduced to writing.")). The Sixth Circuit "has held that courts have the power to summarily enforce settlement agreements, though an evidentiary hearing should be held when a substantial factual dispute exists." *Bamerilease Cap. Corp. v. Nearburg*, 958 F.2d 150, 153 (6th Cir. 1992) (quoting *Aro Corp. v. Allied Witan Co*., 531 F.2d 1368, 1372 (6th Cir. 1976)).

Here, I conducted an evidentiary hearing after concluding that a substantial factual dispute existed with respect to whether the parties entered into a settlement agreement. *See Kukla*, 483 F.2d at 621-22 (finding that entry into agreement is a

substantial dispute requiring evidentiary hearing).Prior to the hearing, Defendants stipulated that "it was Plaintiff's belief (whether mistaken or not) that a settlement had been reached during the April 6, 2023 teleconference for $850 and the removal of the Security Threat Group designation." (ECF No.35, PageID.208.)  Thus, Plaintiff's subjective belief is not contested, and the sole issue before the Court is whether the parties actually and mutually reached an agreement with respect to the material terms of a settlement.[1]  Plaintiff, appearing *pro se*, first presented his position by calling himself to the stand.

Plaintiff testified that during the February 7, 2023 early mediation, he demanded a "couple thousand" dollars and removal of his STG designation, but was only offered $500 without STG removal, so "we failed to settle" despite "going back and forth for a few hours[.]" (ECF No. 36, PageID.221-222.)  He recounted that at the April 6, 2023 teleconference, Mr. Raines offered him a settlement of "$500 and to change the classification, take me off of the security threat." (*Id.*, PageID.223.)  Plaintiff "counter-offered that and told him that [he] would take 850, because [he] wanted to pay for the court costs . . . . So [he] added 350." (*Id.*)  Plaintiff further testified that Raines told him it was "a done deal," and

---

[1] This is why, after initially granting Plaintiff's motion to produce two of his fellow prisoners as witnesses to his post-telephone call understanding that a settlement had been reached and issuing writs for their testimony (ECF Nos. 31, 32, 33 & 34), the Court cancelled the writs by Text-Only Order on the morning of the hearing.

that he would send the release papers to Plaintiff later that day. (*Id.*) According to Plaintiff, he was sure the case had settled:

> I'm sure, because that's what he said and that's what I agreed to. It was plain and simple. It wasn't anything complicated. It was just some simple words. We only had the conference for about five minutes at the most. So it really wasn't anything complicated. And my whole goal was to remove myself from this designation. So I'm sure I knew what it was, what the settlement was.

(ECF No. 36, PageID.224.) During cross-examination, Plaintiff testified that he never received a stipulation to dismiss, a signed settlement agreement, or payment for reaching any purported agreement. (*Id.* at PageID.229.) He further testified that when settling another case in this district, he received those items within a few days after settling his case. (*Id.* at PageID.227.) According to Plaintiff, Raines never indicated that he had to run the settlement by any supervisor or client representative of the MDOC. (*Id.* at PageID.229.)

Defendants called AAG Raines to testify about the alleged settlement. Raines confirmed that during the initial mediation, the case did not settle. (*Id.* at PageID.232.) He further testified that as the Assistant Attorney General assigned to the case, he did not have unilateral authority to settle the matter, but that Jaquine Castillo was present as the client representative for the MDOC. (*Id.*) According to Raines, several weeks after the mediation, Castillo asked him to see if Plaintiff would accept $500 and elimination of the STG designation to settle the case, and Raines understood that he had authority to settle for that particular combination of

8

monetary and nonmonetary terms. (*Id.* at PageID.233, 250-251.) Raines initiated a telephone conference with Plaintiff and offered these terms to Plaintiff, but, consistent with Plaintiff's account, Plaintiff counter-offered by asking for $850 and removal of the STG designation. (*Id.* at PageID.233.) It is important to note that up until this point, Raines and Plaintiff testified identically as to the sequence of events. However, Raines testified that when Plaintiff counter-offered, he told Plaintiff that he did not have authority to settle for Plaintiff's terms and he would have ask his client to see if the terms (*i.e.*, an additional $350 and removal of the STG) were acceptable to the MDOC. (*Id.* at PageID.233-34.) Raines denied ever telling Plaintiff it was "a done deal," and denied ever telling Plaintiff there was a settlement in this case. (*Id.* at PageID.236.) Instead, Raines stated that, "I did tell him that I did believe that it was a reasonable request and so I had no problem reaching out and requesting it." (*Id.* at PageID.234.) Immediately after getting off the phone with Plaintiff, he sent Mr. Castillo an email seeking an extra $350 to settle, but the MDOC declined the offer. (*Id.* at PageID.234-36, 251-52, Defendant's Exhibit A.) In his words, "my client did not agree to additional terms and I was not able to settle this." (*Id.* at PageID.236. )[2] Consequently, Raines

---

[2]At the pre-hearing status conference, trial counsel elucidated further, stating to the Court that, in addition to the rejection of the additional $350 that Plaintiff demanded, "it's since been determined that removal of the STG status would be inappropriate. So the MDOC is no longer interested in pursuing that angle at this time." (ECF No. 30, PageID.184-185.) This occurred "shortly after. Within weeks

never prepared any settlement documents.  (*Id.*.)  Raines testified that there was no resolution to this case, that his client did not agree to the additional terms, and that the parties did not reach an agreement on the material terms of a settlement.  (*Id.* at PageID.236, 254.)

Defendants next called Jaquine Castillo to testify.  (*Id.* at PageID.256.) Castillo testified similarly to Mr. Raines.  He confirmed that he is the MDOC representative with settlement authority for purposes of mediation, and that the case did not settle during the February 7, 2023 mediation.  (*Id.* at 257.)  He further testified that he received an email from Mr. Raines conveying Plaintiff's terms on April 6, 2023, but that the MDOC did not agree to those terms.  (*Id.* at PageID.257-58.)  He indicated that "[i]n his mind, . . . [there was no] settlement reached in this case."  (*Id.* at PageID.258.)  He made clear that AAG Raines did not have authority on April 6th to settle the case for $850 and removal of the STG, that approval of such a settlement would have to "go up the chain of command from my supervisor to the administrator" and that, to his knowledge, the legal administrator of the Office of Legal Affairs had not approved both material terms of the proposed settlement. (*Id.*)

---

of me putting in my [April 25, 2023] appearance." (*Id*., at PageID.185; *see also* ECF No. 13.)

"Before enforcing a settlement, a district court must conclude that agreement has been reached on all material terms." *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 645-46 (6th Cir. 2001) (quoting *Brock*, 841 F.2d at 154). "The intent of the parties when entering a settlement agreement is an issue of fact to be decided by the district court." *Henley*, 141 F. App'x 437, 442–43 (6th Cir. 2005) (quoting *Brown v. County of Genesee*, 872 F.2d 169, 174 (6th Cir. 1989)).

Having considered the testimony presented to the Court, I cannot conclude that an agreement was reached on all material terms of a settlement. All three witnesses testified credibly that no agreement was reached at the initial mediation, and that AAG Raines initiated a follow-up telephone call to reopen negotiations. Raines and Plaintiff both testified credibly that an initial offer was proposed by Raines and that Plaintiff responded with a counter-offer. Consistent with Defendants' stipulation, Plaintiff testified that *he believed* a settlement had been reached and that it was a "done deal." However, Plaintiff's subjective belief is not enough. The Court must find that an actual, mutual agreement was reached on all material terms, including the very existence of an agreement in the first place. To that end, I find that both Raines and Castillo testified credibly that no settlement was reached. Although Raines believed Plaintiff's counter-offer to be reasonable, he did not have authority to accept the offer himself. Moreover, Castillo testified

11

credibly that Raines did not have the authority to accept such an offer, and that no one at the MDOC ever accepted Plaintiff's offer.

"The power of a trial court to enter a judgment enforcing a settlement agreement has its basis in the policy favoring the settlement of disputes and the avoidance of costly and time-consuming litigation . . . . While summary enforcement of a settlement agreement may very well promote the above policy in cases where there exists no substantial dispute as to the entry into, or the terms of, the agreement, summary proceedings may result in inequities when . . . such a dispute does exist." *Therma-Scan, Inc. v. Thermoscan, Inc*., 217 F.3d 414, 419 (6th Cir. 2000) (quoting *Kukla*, 483 F.2d at 621 (citations omitted)).

While the existence of a valid settlement agreement "is not diminished by the fact that the parties have yet to memorialize the agreement," *RE/MAX Int'l, Inc.,* 271 F.3d at 646, it is significant to the Court that no documents were prepared and sent to Plaintiff.  Plaintiff testified that in a previous settlement, he received documents within days, but that in this case he received no documents.  Had Raines believed a settlement had been reached, it seems consistent with both parties' testimony that documents would have been sent almost immediately.  They were not. Instead, the Court finds persuasive the email presented by Defendants that Raines sent to Castillo, conveying the terms of Plaintiff's counter-offer. (Ex. A.)  Had Raines actually believed an agreement had been reached, the email would

12

have been drafted differently.  The Court is also persuaded by the description of the mediation process given by both parties, where everyone was in agreement that Castillo operated as the client representative, and—as in most cases—Attorney Raines would necessarily need to get client approval for any settlement.

This is not a situation where I believe that Plaintiff is knowingly misrepresenting the telephone conversation.  As Defendants conceded, it appears that Plaintiff sincerely believed he had reached a settlement. (ECF No. 35.) Perhaps he misheard something Raines said.  Perhaps he misunderstand when Raines indicated he believed Plaintiff gave a reasonable counter-offer.  I cannot know definitively where the misunderstanding arose, but it is clear to me that the parties did not reach a mutual agreement to settle the case on all material terms. As such, the Court should **DENY** Plaintiff's Motion for Summary Enforcement of Settlement Agreement. (ECF No. 17.)

### 2.  Motion to Dismiss

Having concluded that there was no settlement agreement in this case, I now turn to the motion to dismiss.  Plaintiff brings his action under 42 U.S.C. § 1983 alleging a violation for his "right to be free from retaliation because of [his] right to freedom of speech and association and [his] right to substantive due process in violation of United States Constitution, the First and Fourteenth Amendments." (ECF No. 1, PageID.4.)  Specifically, Plaintiff complains that he was given an

STG designation due to receiving funds from his nephew and his association with his sister, his nephew, and his "long-time friend.". (*Id.* at PageID.5,9-10.) Defendants argue that Plaintiff's complaint fails to state a federal cause of action under § 1983.

### A. First Amendment Claim

The Supreme Court has recognized that prison inmates retain those First Amendment rights not incompatible with their status as prisoners. *Pell v. Procunier*, 417 U.S. 817, 832 (1974); *see also Jones v. Caruso*, 569 F.3d 258, 267 (6th Cir. 2009). Retaliation based on a prisoner's exercise of constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). To plead a First Amendment retaliation claim, Plaintiff must allege that: (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was taken at least in part because of the exercise of the protected conduct. *Id.*

Plaintiff alleges that his First Amendment rights were violated in retaliation for his "intimate and expressive associations with my sister and long time friend who legally transfer funds to my prison account." (ECF No. 1, PageID.5.) He also alleges that Defendant Gowdy continued the STG designation in retaliation for

14

Plaintiff receiving funds from his nephew and associating with his nephew.  (*Id.* at PageID.9)

To the extent Plaintiff argues that receiving money is a protected conduct under the First Amendment, the Court should reject that argument.  As Defendants point out, "[c]ourts have never held that prisoners—or any other citizens—have a fundamental constitutional right to possess spending money . . ."  (ECF No. 14, PageID.69 (quoting *Richards v. Washington*, No. 2:20-CV-194, 2021 WL 1809881, at *12 (W.D. Mich. May 6, 2021)).  As such, receiving money is not a "protected conduct" protected by the First Amendment.

To the extent Plaintiff argues engaging in "intimate associations" with his sister, nephew, or other friends is protected under the First Amendment, this argument, too, must be rejected.  The Constitution protects two types of association: (1) freedom of expressive association, protected by the First Amendment, and (2) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment. *Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6ᵗʰ Cir. 2004) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984); *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6ᵗʰ Cir. 2003); *Corrigan v. City of Newaygo*, 55 F.3d 1211, 1214–15 (6ᵗʰ Cir. 1995)). "With respect to expressive association, the Supreme Court 'has recognized a right to associate for the purpose of engaging in

15

those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Id.* (quoting *Roberts*, 468 U.S. at 618). This is not the type of association which Plaintiff raises in his complaint. Plaintiff complains about his ability to maintain relationships with his nephew, sister, and other friends as the basis for his intimate association related claim.

The Supreme Court recognized a right to intimate association in *Roberts , supra*. In *Roberts*, the Supreme Court held that the choice "to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." 468 U.S. at 617–18. However, the Sixth Circuit has observed that "*Roberts* left unclear which provision of the Constitution protected that right[,]" and held that this "right to intimate association falls under the Fourteenth Amendment," not the First Amendment. *Hartwell v. Houghton Lake Cmty. Sch.*, 755 F. App'x 474, 478 (6th Cir. 2018). In *Hartwell*, the Sixth Circuit noted that *Roberts* reasoning was "based on principles of culture and tradition, autonomy, identity, and ordered liberty." *Id.* (citing *Roberts,* 468 U.S. at 617–20). "With the help of contemporary caselaw, we now know that such reasoning animates substantive due process analysis. We thus find that *Roberts* recognized the right to intimate association under the Fourteenth

16

Amendment." *Id.* Accordingly, Plaintiff's allegations related to any violation of his right to association must proceed under the Fourteenth Amendment, not the First Amendment. As Plaintiff has failed to allege that he was engaged in any "protected conduct" under the First Amendment, the Court should dismiss any claim based on First Amendment retaliation based on failure to state a claim.

### B. Fourteenth Amendment Claim

"The Supreme Court has explained that the right to intimate association 'receives protection as a fundamental element of personal liberty.'" *Anderson*, 371 F.3d at 881 (citing *Roberts,* 468 U.S. at 618). "The kinds of personal associations entitled to constitutional protection are characterized by 'relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.'" *Id*. (citing *Roberts,* 468 U.S. at 620). The Sixth Circuit has explained:

> In *Board of Directors of Rotary International v. Rotary Club of Duarte*, the Court emphasized that although the "precise boundaries" of the intimate association right were unclear, constitutional protection was not restricted to relationships among family members. 481 U.S. 537, 545, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). Instead, the Constitution "protects those relationships . . . that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life.'" *Id.* (quoting *Roberts*, 468 U.S. at 619–20, 104 S.Ct. 3244). Therefore, in addition to marriage, courts have recognized both personal friendships and non-marital romantic relationships as the types of "highly personal relationships" within the ambit of intimate associations contemplated by *Roberts. See, e.g., Akers*, 352 F.3d at 1039–40 ("Personal friendship is protected as an intimate association.").

17

*Id.* at 881–82.  Plaintiff claims an infringement on his right to intimate association with his nephew, sister, and long-time friend.  Assuming, *arguendo*, that those relationships are the type covered by the Fourteenth Amendment's right to intimate association, he has nonetheless failed to state a claim of violation of those rights.

When reviewing an allegation of interference with intimate association, the Court must determine what level of review to apply.  If the interference constitutes a "direct and substantial interference," the Court will apply strict scrutiny review, but "lesser interferences are subject to rational basis review."  *Id.* at 882 (citing *Akers*, 352 F.3d at 1040).  The Sixth Circuit "has developed a general rule that we will find 'direct and substantial' burdens on intimate associations 'only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations].'"  *Id.* at 882 (citing *Akers*, 352 F.3d at 1040).  According to Plaintiff's allegations in his complaint, it is a relatively small universe of friends and family members whose association with Plaintiff are implicated in this case.  As such, the STG policy is subject to rational review.  *See id.* ("Because Anderson continued to enjoy the ability to form intimate associations with anyone other than

fellow police department employees of differing rank, the department's policy is subject to rational basis review.").

According to Plaintiff's allegations, Defendants have not imposed an absolute ban on his interactions with certain family members.  Instead, Plaintiff claims that if he continues to interact with those individuals, then his STG designation will continue to apply.  Plaintiff alleges that Defendant Gowdy said "that the only way that he will recommend the removal of STG and stop the punishment [is] if Plaintiff stop[s] associating with his nephew, and receiving funds from him."  (ECF No. 1, PageID.9.)  Thus, even by Plaintiff's allegations, he is not wholly barred from these associations, he simply must accept the consequences of that association on his security designation.

And to that end, Defendants have identified binding precedent from the Sixth Circuit holding that "[t]he MDOC's policy directive regarding the classification of inmates as STG members is rationally related to the legitimate state interest of maintaining order in the prison."  *Harbin-Bey v. Rutter*, 420 F.3d 571, 576 (6th Cir. 2005) (citing *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 136 (1977) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.")).

Indeed, in *Jones* the Court recognized that "(l)awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." 433 U.S. at 125 (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948) and citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974)).  "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights," with "[p]erhaps the most obvious" right being associational rights.  *Id.*  "The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution. Equally as obvious, the inmate's 'status as a prisoner' and the operational realities of a prison dictate restrictions on the associational rights among inmates."  *Id* at 126. Further, "[b]ecause the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators."  *Id.*

The parties spend a good deal of their briefs detailing Plaintiff's alleged status or interaction with members of the Melanic Islamic Palace of the Rising Sun, but Plaintiff's status with that group is entirely irrelevant to this motion. Plaintiff's complaint alleges that he received an STG security classification due to his receiving money transfers and "third party pin number sharing" with certain

friends and family members.  (ECF No. 1, PageID.8-9.)  Plaintiff alleges that it was those activities that caused him to be given the STG security classification.

Rational basis review puts a "heavy burden" on Plaintiff to "'show there is *no rational basis*' for the classification; by the same token, Defendants 'need not offer any rational basis so long as this Court can conceive of one.'"  *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018) (quoting *Ziss Bros. Constr. Co. v. City of Independence, Ohio*, 439 F. App'x 467, 476 (6th Cir. 2011)) (emphasis in original).  Here, the rational basis for the STG designation is apparent from the face of the complaint, which alleges, *inter alia*, that Sgt. Gowdy informed Plaintiff that his STG status was being continued because "I am receiving funds from an individual [nephew] who is sending money to multiple prisoner[s] around the state." (ECF No. 1, PageID.9, ¶ 16.)  Defendants have a legitimate penological interest in classifying inmates by their actions, by their interactions with others, and by the types of those interactions.  Moreover, the Supreme Court has long recognized that correctional officials are professional experts in matters of security and discipline; as such, they are better suited to make decisions about security and discipline than are the courts. *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). Therefore, courts must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."

*Ward v. Dyke,* 58 F.3d 271, 273 (6th Cir.1995).[3]  Against the background of all of these considerations, the Court should dismiss Plaintiff's Fourteenth Amendment claim, as he has failed to allege facts that could state a claim for a violation of his right to intimate association.

### C. Violation of MDOC Policy

It is not clear whether Plaintiff attempts to bring a claim for violation of MDOC policies, but his complaint does allege that Defendants' actions were in contravention to various MDOC Policy Directives.  (ECF No. 1, PageID.5, 8.) While this language appears to be provided as a way of background, to the extent Plaintiff attempts to base any claims on violation of policy directives, the Court should dismiss any such causes of action for failure to state a claim.

The Sixth Circuit has held that a "defendant's alleged failure to comply with a prison policy directive . . . does not rise to the level of a constitutional violation because the policy directive simply does not create a protectible liberty interest.." *McVeigh v. Bartlett*, 1995 WL 236687, No. 93–00431, (6th Cir. Apr. 21, 1995)

---

[3]This deference is also applicable to the earlier issue of whether the Court should find that there was a meeting of the minds on all material terms of the disputed settlement agreement, which included removal of Plaintiff's security designation. To find and enforce such a condition, the Court would need to be absolutely sure of a complete and mutual understanding on all material terms, both monetary and nonmonetary.  And, as a practical matter, even if such an agreement were to be judicially recognized, that is not to say that the MDOC could not impose another STG designation in the immediate future, if there were reason for doing so.

(citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (1989)).

Indeed, § 1983 "provides a remedy for violations of federal law, not prison policy

or state law." *Webster v. Michigan Dep't of Corr.*, No. 2:23-CV-10704, 2023 WL

2876171, at *3 (E.D. Mich. Apr. 10, 2023) (Edmunds, J.) (citing *Lugar v.

Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney v. Farley*, 501 F.3d 577,

580-81 (6th Cir. 2007)). Thus, alleged violations of MDOC policy do not rise to the

level of a violation or deprivation of a federal constitutional right cognizable under

§ 1983. *See Grinter v. Knight*, 532 F.3d 567, 574 (6th Cir. 2008) (ruling that

"failing to follow proper procedures is insufficient to establish an infringement of a

liberty interest"); *Coleman v. Martin*, 363 F. Supp. 2d 894, 903 (E.D. Mich. 2005)

(Tarnow, J.) ("[T]he failure of a prison, or the state, to follow its own policies and

procedures does not amount to a constitutional violation."). Thus, the Court should

dismiss any claims alleging violations of MDOC policies or procedures for failure

to state a claim upon which relief may be granted under § 1983.

### D. Procedural Due Process Claim

Generally, to state a claim under 42 U.S.C. § 1983, a plaintiff must allege

two elements: (1) a deprivation of rights secured by the "Constitution and laws" of

the United States; which was (2) committed by a defendant acting "under color of

[state] law." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970). A Fourteenth

Amendment procedural due process claim, as alleged here, depends upon the

23

existence of a constitutionally cognizable liberty or property interest with which the state has interfered. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Pusey v. City of Youngstown*, 11 F.3d 652, 656 (6th Cir. 1993). Specifically, to establish a procedural due process violation, a plaintiff must prove that: (1) he was deprived of a protected liberty interest or property interest; and, (2) such deprivation occurred without the requisite due process of law. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 296 (6th Cir. 2006); *see also Swihart v. Wilkinson*, 209 F. App'x 456, 458 (6th Cir. 2006).

"Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)). The Sixth Circuit has held that a change in security designation cannot form the basis of a due process claim:

> "[A]n increase in security classification, such as being classified as a[n] STG member", does not constitute an "atypical and significant' hardship in relation to the ordinary incidents of prison life because a prisoner has no constitutional right to remain incarcerated in a particular prison or to be held in a specific security classification." See *Moody* [*v. Daggett*,] 429 U.S. [78,] 88 n. 9 (rejecting a prisoner's argument that a pending warrant and detainer adversely affected his prison classification and qualification for institutional programs because not "every state action carrying adverse consequences for prison inmates automatically activates a due process right"); *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (holding that "[n]either, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system," and noting that the fact "[t]hat life in one prison is much more disagreeable than in another does not in itself

24

signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules") . . .

*Harbin-Bey*, 420 F.3d at 577.[4]

Defendants point to two District Court cases in Michigan holding that there is no liberty interest in a particular security threat level.  In *Perry v. Knapp*, the Western District of Michigan stated, "Plaintiff claims that due process should protect the removal or reconsideration of his STG status. That interest, however, is not protected by the due process clause."  *Perry v. Knapp*, No. 1:20-CV-694, 2020 WL 5249076, at *4 (W.D. Mich. Sept. 3, 2020).  In so holding, the court explained:

> The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995). The *Sandin* Court concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005).

---

[4]Here, for instance, Plaintiff alleges that at a prior prison he was designated as STG II, was removed from that status and then put back on STG status after being transferred to URF, the focus of this case. (ECF No. 1, PageID.8-9.)

> The Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976).  Prisoners cannot "have a protected liberty interest in the procedure[s] affecting [their] classification and security, because the resulting restraint, without more, [does] not impose and 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Cash v. Reno*, No. 97-5220 1997 WL 809982, at *1 (6th Cir. Dec. 23, 1997); *see also Morris v. Metrish*, No. 97-1624, 1998 WL 246454, at *2 (6th Cir. May 5, 1998); *Moore v. Sally*, No. 97-4384, 1999 WL 96725, at *1 (6th Cir. Feb. 3, 1999).  Without such a protectible interest, Plaintiff cannot successfully claim he has been denied due process, because "process is not an end in itself." *Olim*, 461 U.S. at 250.

*Perry*, 2020 WL 5249076, at *4.  Similarly, Judge Roberts of this Court has also

rejected a claim for violation of procedural due process due to an STG designation,

finding:

> [T]o the extent that Plaintiff challenges his STG classification, he similarly fails to state a viable claim for relief. A prisoner has no liberty interest in a particular security classification.  *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Meachum v. Fano*, 427 U.S. 215, 224-25 (1976); *Newell v. Brown*, 981 F.2d 880, 883 (6th Cir. 1992). Moreover, the United States Court of Appeals for the Sixth Circuit has specifically rejected challenges to STG classifications and resultant restrictions on prisoners with that designation. *See, e.g., Harbin–Bey v. Rutter*, 420 F.3d 571, 576–77 (6th Cir. 2005) (STG designation and resulting permanent restrictions is not an atypical and significant hardship in relation to the ordinary incidents of prison life); *Ford v. Harvey*, 106 Fed. Appx. 397, 399 (6th Cir. 2004) (ruling that STG designation is merely a prison security classification and that prisoner does not have a constitutional right to a particular security level or classification and dismissing civil rights claim); *Ford v. Martin*, 49 Fed. Appx. 584, 586 (6th Cir. 2002) (dismissing due process and equal protection claims arising from classification of a prisoner as an STG member without a hearing). Plaintiff thus fails to state a claim upon which relief may be granted as to this issue.

*Cline v. Tanner*, No. 2:16-CV-14433, 2017 WL 168166, at *2 (E.D. Mich. Jan. 17, 2017) (Roberts, J.).

The precedent here is clear, and the Court should agree with the *Perry* and *Cline* decisions and find that there is no liberty interest in a particular security classification and thus Plaintiff has failed to state a claim for a due process violation.

### E. Substantive Due Process Claim

Substantive due process is "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (internal quotation marks omitted).  It protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that "shock the conscience." *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003).  Substantive due process also "protects the right to be free from 'arbitrary and capricious' governmental actions, which is another formulation of the right to be free from conscience-shocking actions." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014).  In *Range,* the Sixth Circuit summarized the type of behavior needed to "shock the conscience:"

> Over the years, the courts have used several tropes to explain what it means to shock the conscience. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–

47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).  Conduct shocks the conscience if it "violates the 'decencies of civilized conduct.'" *Id.* at 846, 118 S.Ct. 1708 (quoting *Rochin v. California*, 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). Such conduct includes actions "so 'brutal' and 'offensive' that [they do] not comport with traditional ideas of fair play and decency." *Id.* at 847, 118 S.Ct. 1708 (quoting *Breithaupt v. Abram*, 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957)). These are subjective standards, to be sure, but they make clear that the "shocks the conscience" standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation.  *See id.* at 847–48, 118 S.Ct. 1708.

*Range*, 763 F3d at 589-90.  Even construing Plaintiff's *pro se* complaint liberally, there is nothing within the complaint that alleges conduct by Defendants that comes remotely close to "shocking the conscience."

Plaintiff argues:

Defendants created a chilling effect among Plaintiff's family members and friends.  Because of the State's arbitrary and capricious actions, Plaintiff family relation has dwindled in violation of Plaintiff['s] right to intimate and expressive association.  This break up of the family unit . . .  mimic[s] Post-Atlantic Slave Trade. The actions by Defendants should "Shocks the Conscience" of the Federal Courts.

(ECF No. 22, PageID.150.)  The Court should disagree.  Contrary to Plaintiff's attempts to cast it otherwise, he does not plead facts that shock the conscience. While he alleges that receiving money from his nephew (who is apparently "an individual who is sending money to multiple prisoner[s] around the state" (ECF No. 1, PageID.9)) resulted in his STG designation, he does *not* allege that Defendants wholly prevented any association with family members in general or these family members in particular.  Plaintiff is free to continue associating with

28

these family members, and receiving a resulting security designation simply does not shock the conscience.  *See Harris v. Milled*, No. 17-10415, 2018 WL 878885, at *2 (E.D. Mich. Feb. 14, 2018) (Edmunds, J., adopting report and recommendation of Mazjoub, M.J.) (finding allegations surrounding change of security designation does not come "remotely close to meeting this incredibly high standard" to plead a substantive due process claim); *see also Newell v. Brown,* 981 F.2d 880, 886 (6th Cir. 1992) (rejecting substantive due process claim for prisoner's reclassification of security and transfer, and stating "[t]he procedure through which the plaintiff in this case was reclassified and assigned to another prison certainly does not shock our conscience, if that be thought relevant, nor does the procedure offend any canons of decency and fairness of which we are aware.").

The Court should dismiss Plaintiff's substantive due process claim.

### F.  Claim that MDOC Policy is vague and overbroad

Plaintiff's complaint alleges that the "STG Policy Directive 04.04.113 . . . is vague and overbroad . . ."  (ECF No. 1, PageID.5)  Plaintiff asks that  the Court declare that "Policy Directive 04.04.113 regarding STG activities [is] vague and overly broad . . ."  (*Id.* at PageId.8.)  However, the Court should dismiss any facial challenge to an MDOC policy, because he has brought suit against the wrong defendants for such a claim.  Defendant Brown is a Corrections Facility Administration employee and Defendant Gowdy is a custody sergeant.  (ECF No.

14, PageId.86.) "The proper defendant for a challenge to MDOC policy is the MDOC's policy-maker." *Bailey v. Bureau of Health Care Servs.*, No. 1:17-CV-850, 2017 WL 5150786, at *3 (W.D. Mich. Nov. 7, 2017). Plaintiff does not allege that either defendant are policy makers at the MDOC, and the Court should thus find that he has failed to state a claim against these two defendants for any declaration that the MDOC STG policy is vague or overbroad.

### G. Sovereign Immunity

Plaintiff brings claims against Defendants in both their individual and official capacities. The Eleventh Amendment of the United States Constitution bars any suit for money damages, absent consent, against the state. U.S. Const. amend. XI. An action against a state employee in his official capacity is an action against the state. *Brandon v. Holt*, 469 U.S. 464, 471, 105 S. Ct. 873, 878, 83 L. Ed. 2d 878 (1985) ("[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents."). Accordingly, Defendants are "not subject to suit for monetary damages in [their] official capacity under § 1983." *Abdur-Rahman v. Michigan Dep't of Corr.*, 65 F.3d 489, 491 (6th Cir. 1995) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 & n.10 (1989)).

While "state defendants can be sued in their official capacities for injunctive and declaratory relief," *Boyd v. Myers*, 173 F.3d 428 (6th Cir. 1999) (referencing

30

*Will,* 491 U.S. at 71 n. 10), any claim for injunctive or declaratory relief must also be dismissed as Plaintiff has failed to state a claim upon which relief may be granted for any constitutional violation and has not named a policy-making government official against whom injunctive relief could be granted.

Accordingly, the Court should dismiss all claims against Defendants in their official capacities.

## III.   CONCLUSION

For the reasons stated above, the Court should **DENY** Plaintiff's Motion for Summary Enforcement of Settlement Agreement (ECF No. 17) and **GRANT** Defendants' Motion to Dismiss (ECF No. 14).

## IV.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: January 26, 2024

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, January 26, 2024, by electronic and/or
U.S. First Class mail.

s/Aaron Flanigan
Case Manager